*1997 U.S. Dist. LEXIS 13505, **

Time Warner Cable of New York City, Plaintiff, - against - Linda Domsky, et al., Defendants.

96 Civ. 6851 (DAB) (RLE)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1997 U.S. Dist. LEXIS 13505

September 2, 1997, Decided

**DISPOSITION:** **[*1]** Recommended that this judgment entered for plaintiff in the amount of $ 8,590.24 against Mendez and $ 6,840.24 against Malik.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff cable television company sought damages from defendants individuals under the Communications Act of 1934, as amended, 47 U.S.C.S. §§ 553(a) and 605(a), for intercepting the cable company's signals.

**OVERVIEW:** Defendants were individuals who used pirate boxes to intercept the cable company's scrambled signals. The cable company sued the individuals and won default judgments. The cable company then sought damages under the § 605(a). The court entered judgment for the cable company awarding damages for willful violation of § 605(a) of $ 8,590.24 against one individual and $ 6,840.24 against the other plus attorney's fees. The court found that each individual's use of a pirate box was a single statutory violation. Although these amounts reasonably approximated the cable company's lost revenue from the use of the pirate box, they were not sufficient deterrence to limit the damages to the value of the stolen services. Therefore, the court set the damage award at roughly twice the amount of fees avoided, or $ 250 for each month the pirate box was used.

**OUTCOME:** The court entered judgment entered for the cable television company in the amount of $ 8,590.24 against one individual and $ 6,840.24 against the other individual.

**CORE TERMS:** programming, subscriber, pay-per-view, premium, pirate, channel, converter-decoder, cable television, scrambled, unauthorized, reception, signal, cable, box, subscription, descramble, movies, cable television system, broadcast, television, decoder, tier, recommend, willful, viewing, cable operator, scrambling, addressability, descrambling, intercept

**LexisNexis(R) Headnotes** ✦ Hide Headnotes

Civil Procedure > Early Pretrial Judgments > Default > Entry of Default & Default Judgment

HN1 ± A default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability. More Like This Headnote

Communications Law > Federal Acts > Communications Act

HN2 ± 47 U.S.C.S. § 553(a) provides, in pertinent part: No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law. More Like This Headnote

Communications Law > Federal Acts > Communications Act

HN3 ± 47 U.S.C.S. § 553(b) prescribes criminal penalties for willful violations, and 47 U.S.C.S. § 553(c) creates a civil cause of action for any person aggrieved by any violation of 47 U.S.C.S. § 553(a)(1). Civil remedies include injunctive relief, damages, costs and attorney's fees. 47 U.S.C.S. § 553(c)(2). As to damages, the party aggrieved may prove actual damages as specified in 47 U.S.C.S. § 553(c)(3)(A)(i), or may elect to receive, under 47 U.S.C.S. § 553(c)(3)(A)(ii), statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just. Whichever method of computation of damages is chosen, the amount awarded may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C.S. §§ 553(c)(3)(B) and (C). More Like This Headnote

Communications Law > Related Legal Issues > Theft of Service

HN4 ± 47 U.S.C.S. § 605(a) provides, in pertinent part: No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. More Like This Headnote

Communications Law > Federal Acts > Communications Act

HN5 ± 47 U.S.C.S. § 605(e)(1) and (2) prescribe criminal penalties, and 47 U.S.C.S. § 605(e)(3) creates a civil right of action for persons aggrieved. Civil remedies include injunctive relief, costs and attorney's fees, 47 U.S.C.S. § 605(e)(3)(B)(i) and (iii); and either actual damages, 47 U.S.C.S. § 605(e)(3)(C)(i)(I), or an award of statutory damages for each violation in a sum of not less than $ 1,000 or more than $ 10,000, 47 U.S.C.S. § 605(e)(3)(C)(i)(II). In provisions that correspond to 47 U.S.C.S. § 553(c)(3)(B) and (C), the amount awarded under 47 U.S.C.S. § 605 may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C.S. §§ 605(e)(3)(C)(ii) and (iii). More Like This Headnote

Communications Law > Federal Acts > Communications Act

HN6 ± Where programming is broadcast via orbiting satellites, it is therefore protected under 47 U.S.C.S. § 605(a) as radio communications, and unauthorized reception is a violation of § 605(a), which prohibits the unauthorized reception of protected radio communications, as well as 47 U.S.C.S. § 553 (a)(1), which protects all communication by cable systems. A cable operator can be a person aggrieved within the meaning of 47 U.S.C.S. §§ 553(c)(1) and 605(e)(3)(A). More Like This Headnote

Communications Law > Federal Acts > Communications Act

HN7 When a court determines that a defendant's conduct has violated the Communication Act of 1934, 47 U.S.C.S. §§ 605 and 553, a plaintiff may recover damages only under one of those sections. An aggrieved cable operator is entitled to elect to recover damages under 47 U.S.C.S. § 605 in consideration of § 605's higher damages awards. More Like This Headnote

**COUNSEL:** For TIME WARNER CABLE OF NEW YORK CITY, plaintiff: Daniel John Lefkowitz, Law Offices of Daniel J. Lefkowitz, Jericho, NY.

For ROBERT METZLER, defendant: Maureen Michele Finn, RESID., NY, NY.

For LUIS MONTALVO, defendant: Mary E. Sheridan, Matthew F. Cooper, Esq., New York, NY.

DANI ORTOLANO, counter-claimant, Pro se, New York, NY.

For TIME WARNER CABLE OF NEW YORK CITY, counter-defendant: Daniel John Lefkowitz, Law Offices of Daniel J. Lefkowitz, Jericho, NY.

**JUDGES:** Honorable Ronald L. Ellis, United States Magistrate Judge. HONORABLE DEBORAH A. BATTS, U.S.D.J.

**OPINIONBY:** Ronald L. Ellis

**OPINION: REPORT AND RECOMMENDATION**

**To the HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

## I. INTRODUCTION

This is an action by a cable television system operator against twenty-one individuals for unauthorized interception and viewing of plaintiff's "scrambled" cable-borne television signals by means of an illegal decoder device. On February 10, 1997, default judgments were entered against Sigfredo Mendez and Jackie Malik, the two defendants who are the subject **[*2]** of this Report and Recommendation. The matter was referred to the undersigned for an inquest on damages. Plaintiff seeks damages pursuant to the Communications Act of 1934, as amended, 47 U.S.C. §§ 553(a) and 605(a). For the reasons stated below, I recommend that judgment be entered for plaintiff in the amount of $ 8,590.24 against Mendez and $ 6,840.24 against Malik.

## II. BACKGROUND

Time Warner Cable of New York City ("TWCNYC") is a cable television operator which has been awarded franchises by New York City. Affidavit of Thomas Allen, dated March 9, 1997, submitted in support of inquest for damages ("Allen Aff."), at P 2. Pursuant to these franchises, TWCNYC is authorized to construct, operate and maintain cable television programming in New York, Kings, and Queens Counties. **Id.** TWCNYC programming consists of various tiers of cable television programming and

different individual programming channels. **Id.** at P 3. The "Broadcast Basic" and "Standard" service tiers, for example, are levels of cable television programming service which an individual can subscribe to at a monthly rate which allows a subscriber to receive a package of different programming channels, **[*3]** such as CNN, A&E and MTV, but does not include any "premium" or pay-per-view programming. **Id.** at P 3.

TWCNYC subscribers may elect to subscribe to one or more "premium" programming services such as Cinemax, Home Box Office and Showtime, for an additional monthly charge per service. **Id.** at P 4. TWCNYC also offers pay-per-view programming, which is a service enabling a subscriber to purchase individual movies, sporting events, or other entertainment for a per-event fee over and above the subscriber's regular monthly fee. **Id.** at P 5. Each subscriber is entitled to receive only the level of programming and services which he or she selects and pays for. **Id.** at P 6.

TWCNYC receives the signals to all of its premium and most of its pay-per-view programming channels by transmissions received via orbiting satellites from the producers of such programming. **Id.** at P 7. TWCNYC's premium and pay-per-view programming is protected from unauthorized reception during its transmission to TWCNYC's satellite reception facilities, known as the cable "head-end." **Id.** The signals for all of TWCNYC's cable television services are transmitted from **[*4]** TWCNYC reception facilities to subscribers' residences through a network of cable wiring and equipment (the "System"). TWCNYC retransmits or "cablecasts" the signals to its premium and pay-per-view programming, along with all other programming offered by TWCNYC, in a simultaneous data stream to subscribers over its cable television system. **Id.**

For a subscriber to receive these transmitted cable television signals on his or her television set, TWCNYC provides each subscriber with a device known as a "converter," which converts the multiple signals simultaneously transmitted over the System into different "channels," which can be viewed on a subscriber's television set. **Id.** at P 8. To prevent subscribers from receiving programming services for which they have not paid, TWCNYC encodes or "scrambles" the signals to all of its premium and pay-per-view programming services. **Id.** at P 9. "Scrambling" is a principal security measure used by TWCNYC and other cable operators to protect their programming services against unauthorized reception of service. **Id.** Subscribers purchasing scrambled channel options are provided with a device known as a "descrambler" **[*5]** or "decoder," which is incorporated into a converter. **Id.** The decoder descrambles the encrypted programming which is purchased by a subscriber so that the purchased programming can be viewed clearly on a subscriber's television set. **Id.** Programming not purchased will continue to be scrambled and, therefore, will be unviewable on the subscriber's television set. **Id.**

TWCNYC separately authorizes, either by a technical modification or by a computer command, each of the converter-decoders provided to its subscribers to descramble only those scrambled programming channels which the respective subscriber has selected and purchased. **Id.** at P 10. The converter-decoders which TWCNYC provides to its subscribers have the technology feature and function known as "addressability." **Id.** Addressability is a communication link between a cable operator's central computer and the descrambling and computer circuitry in each converter-decoder provided to its subscribers. **Id.** Addressability enables a cable operator to send a signal command to the converter-decoders assigned to those subscribers who have purchased a pay-per-view program. **[*6]** **Id.** The signal

command instructs the converter-decoder assigned to those subscribers to descramble the particular pay-per-view program which has been purchased. **Id.** When the pay-per-view program is over, another command is sent for those converter-decoders to resume scrambling pay-per-view programming. **Id.** This procedure limits a subscriber's authorized reception of pay-per-view programming to only those programs which have been purchased. **Id.** Addressability also enables a cable operator to upgrade or downgrade their subscribers' authorized levels of service without having to mechanically alter or physically replace a converter-decoder by way of a service call to a subscriber's residence. **Id.**

TWCNYC's contract agreements with its subscribers forbid unauthorized tampering with TWCNYC's equipment and the unauthorized reception of programming services. **Id.** at P 12. It is possible, however, for an individual to install a modified or "pirate" converter-decoder onto TWCNYC's cable system in place of TWCNYC's authorized converter-decoder. **Id.** "Pirate" devices enable reception of all of TWCNYC's scrambled programming, including **[*7]** all premium and pay-per-view channels, without the subscriber paying for such programming. **Id.** In most cases, TWCNYC cannot detect or prevent the theft of its programming services from "pirate" converter-decoders without affirmative permission from a subscriber to conduct an on-site inspection. **Id.**

TWCNYC's claims against defendants Malik and Mendez arose after TWCNYC recovered the records of the business known as Freedom Electronics of Fort Lauderdale, Florida ("Freedom"). **Id.** at P 13. TWCNYC instituted litigation against Freedom for its sale and distribution of "pirate" converter-decoders which Freedom knew and intended would be used to intercept and descramble TWCNYC's scrambled premium, pay-per-view and other programming service without TWCNYC's authorization. **Id.** Freedom's business records included sales invoices of "pirate" converter-decoders which Freedom sold and shipped to TWCNYC subscribers. **Id.** TWCNYC's complaint against the two defendants in default, Jackie Malik and Sigfredo Mendez, alleges that these individuals intercepted and received TWCNYC's premium and pay-per-view programming without TWCNYC's authorization by the **[*8]** use of "pirate" converter-decoders purchased from Freedom. **Id.**

**A. Sigfredo Mendez**

The sales records of Freedom indicate that on February 9, 1994, Mendez purchased a "Base Band Epoxy Cube," which was shipped to his residence in New York County. **Id.** at P 14. A Base Band Epoxy Cube is a "pirate" cable descrambling device which is manufactured only by "pirate" vendors such as Freedom and is not used by any franchised cable television operator. **Id.** The sole function of this device is to enable its user to descramble cable television broadcasts, and it has no legitimate (non-theft related) purpose on a cable television system. **Id.** This device is specifically designed to defeat the type of scrambling technology used by TWCNYC on its cable television system in lower Manhattan, where Mendez resides, thereby enabling Mendez to have unauthorized access to all of TWCNYC's scrambled premium and pay-per-view programming. **Id.**

From April 16, 1987, to the present, Mendez has been a residential subscriber to TWCNYC's cable television service at his residence. On February 9, 1994, the date he purchased the "pirate" box, Mendez subscribed to TWCNYC's **[*9]** "Standard" service tier and had purchased a subscription to two premium channels, Cinemax and Showtime. **Id.** On February 28, 1994, Mendez downgraded and canceled his

subscription to Cinemax and Showtime to just Standard service. **Id.** Later, on April 13, 1995, Mendez canceled his subscription to Standard service and ordered TWCNYC's "Broadcast Basic" service tier. **Id.** Mendez has not purchased any pay-per-view programming since February 9, 1994. **Id.**

**B. Jackie Malik**

The sales records of Freedom indicate that on September 9, 1994, Malik purchased a "97.5 Cube," which was shipped to her residence in New York County. **Id.** at P 16. This device is another type of "pirate" cable descrambling device which is manufactured only by "pirate" vendors and is not used by any franchised cable television operator. **Id.** The sole function of this device is to enable its user to descramble cable television programming services such as premium and pay-per-view channels, and it has no legitimate (non-theft related) purpose on a cable television system. **Id.** This device is specifically designed to defeat the type of scrambling technology used **[*10]** by TWCNYC on its cable television system in lower Manhattan, where Malik resides, thereby enabling Malik to have unauthorized access to all of TWCNYC's scrambled premium and pay-per-view programming. **Id.**

From August 30, 1994 to the present, Malik has been a residential subscriber to TWCNYC's cable television service at her residence. **Id.** at P 17. On September 9, 1994, the date of Malik's purchase of a descrambling cube, Malik subscribed to TWCNYC's "Standard" service tier. **Id.** Between September 9, 1994 and the institution of this action, Malik did not purchase any premium or pay-per-view channels and her subscription to Standard service was constant and unchanged. **Id.**

By use of the "pirate" devices purchased from Freedom, defendants Mendez and Malik had access to all of TWCNYC's scrambled premium channels and had constant, round-the-clock reception to pay-per-view programming services without having to pay for such programming. **Id.** at P 18.

TWCNYC's Standard service carries a subscription rate of approximately $ 30 per month. **Id.** at 8 n.2. A subscription to all of TWCNYC's premium channels costs approximately $ 70 per month. **[*11]** **Id.** Pay-per-view movies cost approximately $ 4 per event, while some pay-per-view special events, such as championship boxing matches, can cost as much as $ 40. **Id.** Although it is not possible to know exactly how many programs were intercepted by defendants, they could have viewed hundreds of dollars worth of programming each month.

**III. DISCUSSION**

The defendants have failed to appear or defend in this action and have been adjudged in default by the order entered by Judge Batts. HN1"[A] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability." **Bambu Sales, Inc. v. Ozak Trading, Inc.**, 58 F.3d 849, 854 (2d Cir. 1995) (quoting **Trans World Airlines, Inc. v. Hughes**, 449 F.2d 51, 63 (2d Cir. 1971), ***rev'd on other grounds***, 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647(1973).

Plaintiff was directed by the undersigned to submit affidavits and any other documentation in support of its request for damages. Plaintiff argues that each month of unauthorized service is a separate statutory violation and seeks maximum statutory damages of $ 10,000 under 47 U.S.C. § 605 for each of the claimed **[*12]** violations.

**A. Statutory Framework**

HN2 Section 553(a) of title 47 of the United States Code provides, in pertinent part: No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

HN3 Subsection (b) prescribes criminal penalties for willful violations, and subsection (c) creates a civil cause of action for "any person aggrieved by any violation of subsection (a)(1)." Civil remedies include injunctive relief, damages, costs and attorney's fees. 47 U.S.C. § 553(c)(2). As to damages, the party aggrieved may prove "actual damages" as specified in subsection (c)(3)(A)(i), or, as plaintiff has done here, may elect to receive, under subsection (c)(3)(A)(ii), "statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just." Whichever method of computation of damages is chosen, the amount awarded may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C. §§ 553(c)(3)(B) **[*13]** and (C).

HN4 Section 605(a) of title 47 of the United States Code provides, in pertinent part: No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

47 U.S.C. § 605(a). HN5 Subsections (e)(1) and (2) prescribe criminal penalties, and subsection (e)(3) creates a civil right of action for "person[s] aggrieved." 47 U.S.C. § 605(e)(3)(A). Civil remedies include injunctive relief, costs and attorney's fees, § 605(e)(3)(B)(i) and (iii); and either "actual damages," § 605(e) (3)(C)(i)(I), or "an award of statutory damages for each violation . . . in a sum of not less than $ 1,000 or more than $ 10,000 . . . ," § 605(e)(3)(C)(i)(II). In provisions that correspond to § 553(c)(3)(B) and (C), the amount awarded under § 605 may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. §§ 605(e)(3)(C)(ii) and (iii).

**B. Defendants' Liability**

TWCNYC's HN6 programming is broadcast via orbiting satellites and is therefore protected under 47 U.S.C. § 605(a) as radio communications, **[*14]** and defendants' unauthorized reception is a violation of 47 U.S.C. § 605(a), which prohibits the unauthorized reception of protected radio communications, as well as § 553 (a)(1), which protects all communication by cable systems. **International Cablevision, Inc. v. Sykes**, 75 F.3d 123, 133 (2d Cir. 1996) **("Sykes II"); Time Warner Cable of New York City v. U.S. Cable T.V., Inc.**, 920 F. Supp. 321, 328-29 (E.D.N.Y. 1996). TWCNYC is a "person aggrieved" within the meaning of 47 U.S.C. §§ 553(c)(1) and 605(e)(3)(A).

HN7 When a court determines that a defendant's conduct has violated both § 605 and § 553 of the Communications Act, a plaintiff may recover damages only under one of those sections. **American Cablevision of Queens v. McGinn**, 817 F. Supp. 317, 320 (E.D.N.Y. 1993). An aggrieved cable operator is entitled to elect to recover

damages under § 605 in consideration of § 605's higher damages awards. **International Cablevision, Inc. v. Sykes**, 997 F.2d 998, 1007 (2d Cir. 1993); **Sykes II**, 75 F.3d at 127.

TWCNYC has elected to recover money damages against each defendant in the form of statutory damages as opposed to actual damages, and **[*15]** seeks enhancement for willful violations. Because this case resulted in a default judgment, there is no evidence to contest the finding of willful violation. Defendants, however, could not have believed that they were legitimately entitled to descramble the broadcasts using the pirate boxes. These were willful violations. Plaintiff is entitled to some enhancement of the damages award. Although there is no proof that defendants profited from the use of the illegal boxes, such use did deprive plaintiff of significant income. The enhancement of damages for willfulness should, therefore, take into account the duration of the violation.

**C. Calculation of Damages**

TWCNYC argues that each month in which the pirate device was used by one of the defendants constitutes a separate violation because each month represents a separate billing cycle in which the defendants failed to purchase programming. In addition, TWCNYC asserts that the violations were willful and justify awarding damages at the highest level. TWCNYC thus seeks the maximum statutory damages of $ 10,000 for each month for which the device was connected. Defendant Mendez used his device for a period of thirty-one (31) **[*16]** months and defendant Malik for a period of twenty-four (24) months. This results in damage requests of $ 310,000 and $ 240,000 against Mendez and Malik, respectively.

The court disagrees with plaintiff that each month should be considered a separate statutory violation. In this case, the violation is the use of a pirate box to intercept TWCNYC's scrambled cable broadcasts. While the interpretation suggested by TWCNYC would maximize the damages and, therefore, the deterrence effect, the statutory language more strongly supports the conclusion that there was one violation in this case, although of varying duration for each defendant. Indeed, if the court were to follow the plaintiff's reasoning, there would be a violation for each pay-per-view telecast. Each pay-per-view program requires a separate authorization from plaintiff and would therefore be considered a separate violation under plaintiff's analysis. I find that each defendant's use of a pirate decoder constitutes a single statutory violation.

According to plaintiff, its Basic service costs approximately $ 30 per month while subscription to all premium channels costs approximately $ 70 per month. The plaintiff thus potentially **[*17]** loses $ 40 per month when a pirate box allows a user to receive scrambled channels. In addition, the plaintiff provides multiple pay-per-view events, movies, and special events each month. Pay-per-view movies cost approximately $ 4 per viewing, and special events, such as boxing matches, may cost as much as $ 40 per broadcast. While it is not possible to know how many movies the defendants would have viewed illegally, more than a dozen movies are available each month. The viewing of ten to twelve movies at $ 4 per movie and one premium event at $ 40 would result in an additional loss to plaintiff of approximately $ 80 to $ 88 per month. n1 Adding this amount to the $ 40 lost on premium programming, the total loss to plaintiff would be approximately $ 120 to $ 128 per month.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 These decoders were used in private residences. While in theory defendants could have viewed every pay-per view offering each time it was broadcast, I have attempted to make a reasonable assessment of actual use by a private violator as opposed to a commercial violator. Time and taste would limit the actual viewing by defendants.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*18]**

While I find that these amounts reasonably approximate the lost revenue from the use of a pirate box, it would not be sufficient deterrence if the damages payable by a violator were limited to the value of the stolen services. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid. The statute recognizes this fact in setting a minimum damage award of $ 1,000. I find that the damage award should be roughly equivalent to twice the amount of fees avoided, or approximately $ 250 per month.

Defendant Mendez began using his pirate box on or about February 1994 and defendant Malik began using his box in September 1994. The complaint was filed in September 1996. Mendez thus deprived TWCNYC of thirty-one (31) months of payments and Mendez, twenty-four (24) months. At $ 250 per month, Mendez shall be liable for damages of $ 7,750 and Malik for damages of $ 6,000.

**C. Attorney's Fees**

Plaintiff has submitted an affidavit by William B. Jung indicating the tasks performed, the hours spent, and the rate requested. I have examined the supporting documentation and conclude that plaintiff's attorney's fees and disbursements were reasonable **[*19]** and adequately documented. Plaintiff seeks a total award of $ 1,680.48, divided equally between the two defendants. I therefore recommend that TWCNYC be awarded $ 840.24 against each defendant.

**III. CONCLUSION**

For willful violation of § 605(a), I recommend that defendant Mendez pay statutory damages of $ 7,750, plus costs and attorney's fees of $ 840.24, for a total of $ 8,590.24. For willful violation of § 605(a), I recommend that defendant Malik pay statutory damages of $ 6,000, plus costs and attorney's fees of $ 840.24, for a total of $ 6,840.24. Judgment should be entered accordingly.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal **[*20]** to the United States Court of Appeals. ***See*** **Thomas v. Arn**, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); **Small v. Secretary of Health and Human Services**, 892 F.2d 15, 16 (2d Cir. 1989) (***per curiam***); 28 U.S.C. §

636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: September 2, 1997**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**

**United States Magistrate Judge**