**UNITED STATES DISTRICT COURT**

**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **CoxCom, Inc. dba Cox Communications New England**<br><br>Plaintiff,<br><br>vs.<br><br>**Oscar Montenegro**<br><br>Defendant | **Case No.: CA 04 384 ML**<br><br>**AFFIDAVIT OF MARK MATTEO** |

Now comes the affiant, and makes this his sworn statement, under the pains and penalties of perjury, of his own personal knowledge.

1. My name is Mark Matteo.
2. I am employed by Cox as a Security Supervisor.
3. I am familiar with the business records of Cox associated with the Defendant, Oscar Montenegro.
4. I have been trained and I am familiar with coaxial cable non-addressable descrambling and with technology designed to covertly descramble cable television's scrambling/security system.
5. I have been trained and I am familiar with the testing of converters/descramblers to determine if such devices have been modified to receive unauthorized interception of signals.
6. Cox issues/leases devices to its subscribers called "**addressable converters/descramblers**". These devices convert signals for older televisions that

are not "cable ready" and they descramble signals based upon the instructions that the cable company sends to the addressable converter/descrambler. The crucial element of the addressable converter/descrambler is that it is "addressable". That means the cable company can "address" the descrambler. "Addressability" refers to the descramblers ability to descramble signals based only upon the instructions that it receives from the cable company.

7. In the fall of 2001 the defendant was in possession of and had issued to his account a particular Pioneer brand converter/descrambler, bearing serial number 94S5P7; the box had been issued to the Defendant on March 16, 1994.

8. In September of 2001 Cox received an anonymous phone call where the caller indicated that the defendant was receiving Cox's signals without authorization.

9. Based upon this information it was determined that I should do some addressability tests on box number 94S5P7 to determine if it was addressable, that is to determine if the box still took instructions.

10. On October 11, 2001 I initiated the sending of electronic instructions to box number 94S5P7. These instructions, if received, as they should have been by the box, would have created *an anomaly* in the box. In fact, they should have instructed the box to cease all operations such that the box would no longer operate at all.

11. As part of the investigation into this matter, a Cox employee called the defendant's phone number on October 24, 2001 and inquired as to whether the *cable box* was receiving channels with no problem. A female individual confirmed that she was at the address and the cable service was working "fine".

12. The television operations through box 94S5P7 *should* not have been working "fine" at this point in time. If it had been taking instructions it would have ceased

operations. If the box had been modified to refuse to take instructions that would explain why the instructions to shut down the box had not reached the box.

13. On November 14, 2001 Cox employees went to the home of the Defendant. They were met at the home by an individual who identified herself as the wife of the Defendant. One of the employees inquired as to whether she was having any problems with the cable service. She stated "no'. She was then informed that the cable box in question was apparently refusing to take instructions and then the employees must take the box to examine it.
14. She then voluntarily allowed the employees to remove box 94S5P7.
15. Shortly after converter/descrambler box 94S5P7 (hereinafter the "device") was returned to Cox I tested the device. The box was found to be receiving and descrambling all analog cable channels including the premium channels and pay-per-view channels. The box and the defendant's account were not authorized to receive these channels.
16. My examination of box 94S5P7 revealed that there was evidence of it having been reprogrammed by a device not authorized by Cox such as a so called "field test generator" (FTG/CUBE). A field test generator could modify the box to covertly allow the box to receive channels it was not legitimately authorized to receive.
17. My examination of box 94S5P7 also revealed evidence that Cox's communications with the box to reset the box to take instructions had been inhibited by either the use of an in-line device such as a data/FM trap or on in-line field test generator.
18. Essentially my examination of box 94S5P7 revealed evidence that the box had most likely been modified by a field test generator to open up the box to descramble all

analog stations and that the periodic instructions sent to the box and the specific testing instructions I sent to this particular box were being blocked either by a filtering device or by a field test generator that also acted as a filtering device to keep out the new instructions.

19. My findings with reference to the box were consistent with the fact that even after I instructed the box to essentially shut down it kept operating. It would keep operating if my instructions were blocked out of the box by some type of filtering device.

20. On December 10, 2001 an employee of Cox went to the Defendant's address. He was allowed in to examine the televisions in the home voluntarily. Using a signal level meter he was able to determine that Cox's instructions to the new box which had been placed at the home to replace the subject box was not getting instructions from Cox. Upon further examinations, he found 2 FM traps/data blockers connected to the cable line behind the television in the living room.

21. The devices found at the Defendant's home on December 10, 2001 are precisely the type of devices that would block Cox's instructions from getting to our boxes.

22. This Defendant's account history reveals that the Defendant only purchased standard, non-premium service while in possession of the subject box and he did not order premium channels or pay-per-view offerings *while* in possession of the device.

23. At the pertinent time the defendant was paying $15.38 per month for his cable television service. Bear in mind that an individual in possession of a descrambling device, in this case a modified converters/Descrambler, would still need to purchase some cable television signals from the Plaintiff in order to allow signals to enter the home and thereafter be descrambled.

24. All the time that the defendant was in possession of the subject box, from March, 1994 to November, 2001, defendant account history revealed that he never ordered any premium channels or pay-per-view events.

25. During the above referenced 92 month period, the Defendant was paying on average $15.38 per month for her service from the Plaintiff.

26. During the above referenced 92 month period the charge for all of the premium channels that would have been available to the Defendants through the use of the black box, averaging into the calculation the fact that signals were being transferred to digital feed over that period of time, varied significantly but on average that monthly amount would be $32.85.

27. The differential between the value of the premium channels the Defendants were receiving through the use of the black box and the amount he was paying for was $32.85; accordingly, the net value of premium channel services received through the use of the black box would be $32.85 per month.

28. During the above referenced 92 month period, the charge for and the number of pay per view offerings that were accessible to the Defendants through the use of the black box, averaging into the calculation the fact that signals were being transferred to digital feed over that period of time varied significantly but, on average, there were numerous movies offered per month at a cost of $3.95 per movie,

29. During the above referenced 92 month period the charge for and the number of adult pay per view offerings that were accessible to the Defendants through the use of the black box, averaging into the calculation the fact that signals were being transferred

to digital feed over that period of time varied significantly but, on average, there were numerous offerings available per month at an average cost of $8.95 per offering.

30. During the above referenced 92 month period the charge for and the number of special event pay per view offerings that were accessible to the Defendants through the use of the black box, averaging into the calculation the fact that signals were being transferred to digital feed over that period of time varied significantly but, on average there was at least one special event (e.g.; boxing or wrestling match) per month at a cost of between $9.95 and $54.95 per special event.

Subscribed and sworn to, under the pains and penalties of perjury, this 18th day of August, 2005.

Mark Matteo